UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |  |
|---|---|---|---|
| ARMANDA C. SOUSA, | ) |  |  |
|  | ) |  |  |
| Plaintiff | ) |  |  |
|  | ) | CIVIL ACTION |  |
| v. | ) | NO. 10-11198-WGY |  |
|  | ) |  |  |
| MICHAEL J. ASTRUE, | ) |  |  |
| Commissioner of Social Security, | ) |  |  |
| Defendant. | ) |  |  |
|  | ) |  |  |

MEMORANDUM OF DECISION

YOUNG, D.J.                                                May 9, 2011

## I.  INTRODUCTION

The plaintiff, Armanda C. Sousa ("Sousa"), brings this
action pursuant to section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), seeking judicial review of the final decision of
the Commissioner of Social Security (the "Commissioner") denying
her application for Social Security Disability Insurance
Benefits.  She argues that the Commissioner's decision was not
based on substantial evidence because the determination of her
residual functional capacity did not include certain limitations
on the use of her right arm.  She further claims that the
hypothetical posed to a vocational expert at the oral hearing on
her application did not include all of her relevant limitations.
Sousa requests that this Court reverse the decision of the

Commissioner.

**A.  Procedural Posture**

On March 4, 2008, Sousa applied for Social Security Disability Insurance Benefits.  Admin. R. 94-102.  The Social Security Administration (the "Administration") denied that application on May 9, 2008.  <u>Id.</u> at 57-59.  Upon Sousa's request for reconsideration, the application was again denied on October 2, 2008.  <u>Id.</u> at 64-66.  Sousa then requested a hearing, <u>id.</u> at 67-70, which took place on January 28, 2010, <u>see</u> <u>id.</u> at 72.  The hearing officer issued a decision denying Sousa's application for benefits on February 25, 2010.  <u>Id.</u> at 4-6.  The Administration's Decision Review Board selected Sousa's case for review but failed to complete its review during the allotted time.  <u>Id.</u> at 1.  As a result, the hearing officer's decision became the final decision of the Commissioner.  <u>Id.</u>

Sousa filed this suit on July 20, 2010, appealing the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  <u>See</u> Compl., ECF No. 1.  On January 31, 2011, she filed a motion for an order reversing the decision of the Commissioner.  ECF No. 11.  The Commissioner then filed a motion for an order affirming his decision.  ECF No. 14.  The Court now addresses these two motions.

**B.  Factual Background**

Sousa was born in 1963.  Admin. R. 28.  She has an eighth-

grade education and has completed a GED.  <u>Id.</u>  Her past work

experience includes jobs as an assembler of badges and rosettes

before 1996, as an assembler of chest drainage units from 1997 to

2004, and as a hospital unit assistant from 2004 to 2007.  <u>Id.</u> at

31-32, 124.  She has not worked since November 2007.  <u>Id.</u> at 123.

### 1.  Shoulder Pain

Sousa began suffering from tendinitis in her right rotator

cuff in 2003.  <u>Id.</u> at 293.  In May 2003, she sought treatment

from Dr. Richard Jaslow ("Dr. Jaslow"), who diagnosed her as

having "crepitation on range of motion of the shoulder" and "Type

II acromion."  <u>Id.</u>  On follow-up, Dr. Jaslow noted that Sousa's

symptoms persisted and opined that they were being caused by the

repetitive motions required at her job as an assembler.  <u>Id.</u> at

292.  Because Sousa was not responding to minimally invasive

treatments including injections, oral anti-inflammatory

medications, and physical therapy, Dr. Jaslow performed

exploratory surgery on her right rotator cuff in July 2003,

surgically reshaping her acromion.  <u>Id.</u> at 279, 292.  After

surgery, Sousa engaged in a work conditioning program and

physical therapy.  <u>Id.</u> at 290.  In October 2003, Dr. Jaslow noted

that Sousa had full range of motion in her shoulder but did not

yet feel at full strength.  <u>Id.</u> at 289.  Dr. Jaslow authorized

Sousa to return to work at the end of October 2003.  <u>Id.</u>  In

December 2003, Dr. Jaslow noted that Sousa's shoulder was "much

better than what it was before her operation" but that she was still experiencing pain.  Id.  He advised her that her shoulder was likely to continue to improve and that she should follow-up with him again in four weeks.  Id.

Sousa did not return to see Dr. Jaslow again until July 2007, when she saw him for complaints of neck, back, and shoulder pain.  Id. at 287.  After examination, Dr. Jaslow diagnosed Sousa with rotator cuff tendinitis in both shoulders and mild degenerative disc disease.  Id. at 288.  He advised her that it was important to keep her neck in a neutral position and suggested an exercise program involving stretching and strengthening.  Id.  A follow-up examination showed moderate tenderness of the shoulder with crepitation on active range of motion.  Id. at 285.  Sousa had full range of motion in her cervical spine.  Dr. Jaslow injected Sousa's shoulder with Xylocaine and Celestone.  Id.

In August 2007, Dr. Jaslow referred Sousa to an orthopedist, Dr. Jeremy Stern ("Dr. Stern"), due to continued pain in her right shoulder.  Id. at 212.  Dr. Stern found that Sousa had normal range of motion of her cervical spine and full range of motion in both shoulders.  Id.  An x-ray showed that she had Type II acromion, and he diagnosed her with impingement syndrome.  Id. Dr. Stern scheduled Sousa for arthroscopic subacromial decompression.  Id.  This decompression surgery took place in

November 2007.  Id. at 208.  Ten days after surgery, Dr. Stern
examined Sousa and noted that she was "doing very well, [with]
minimal discomfort," that she had "excellent mobility," and that
"her rotation is normal on external but only to about her belt
line on internal."  Id. at 207.  In January 2007, Dr. Stern again
examined Sousa and stated that she had "somewhat limited" range
of motion and some discomfort, but that her strength and motion
were improving.  Id. at 206.  At further examinations in
February, April, and June 2008, Dr. Stern recorded that Sousa was
still suffering some pain in her shoulder but that she had full
range of motion.  Id. 203-05.  In February and April he
instructed her not to return to work, and in June opined that he
"[did] not think that [Sousa] would be able to do a lot of
repetitive work with her arms."  Id. at 203.

    **2.  Back Pain**

    While Dr. Stern was treating Sousa's shoulder problems, she
was simultaneously seeing her primary care physician, Dr. Ann
Grady ("Dr. Grady"), for back pain.  See id. at 236-37.  An MRI
done in August 2007 showed a small left lateral protrusion at the
L4/L5 vertebrae contacting the nerve root and mild degenerative
disc disease with mild disc bulge at the L3/L4 vertebrae.  Id. at
294-95.  In October 2007, Sousa was examined by Dr. Angela
Simpson ("Dr. Simpson"), who stated that she suffered pain with
limited range of motion secondary to stiffness and discomfort,

but full range of motion of her lower extremities.  _Id._ at 238.
Dr. Simpson prescribed a muscle relaxant and encouraged Sousa to
lose weight and engage in physical therapy.  _Id._

In November 2007, acting upon a referral from Dr. Grady,
Sousa saw Dr. Parakrama M. Ananta ("Dr. Ananta"), a specialist in
rehabilitation and physical medicine.  _Id._ at 163.  Dr. Ananta
observed minimal lumbar paraspinal spasm and restricted range of
motion in the lumbar and cervical spine, but noted that Sousa had
normal muscle strength in her extremities and no significant
sensory deficits.  _Id._  An MRI showed multilevel degenerative
disc disease of the lumbar spine without nerve root compression
and a small central disc protrusion without significant nerve
root compression.  _Id._ at 164.  Dr. Ananta diagnosed Sousa with
cervical and lumbar degenerative joint disease with mechanical
pain; he recommended physical therapy and home exercise programs.
_Id._  On follow-up in January 2008, Dr. Ananta found that Sousa
had improved range of motion of the lumbar spine and recommended
continued physical therapy.  _Id._ at 162.  At some point, Dr.
Ananta also recommended cortisone shots, which Sousa declined.
_Id._ at 306.

In August 2009, Sousa was examined by Dr. Shobita Sundar
("Dr. Sundar"), who noted that her motor strength was normal in
all extremities.  _Id._ at 306-08.  Sousa requested a
recommendation for a doctor from whom she could receive a second

6

opinion regarding her back pain, and Dr. Sundar gave her a
referral.  Id.

### 3.    Urinary Incontinence

In 2008, Sousa was diagnosed with urinary stress
incontinence.  Id. at 213.  Dr. Moustafa Ali ("Dr. Ali")
performed a surgical transvaginal taping procedure to remedy this
diagnosis in June 2008.  Id.

### 4.    Anxiety

Medical records show that Sousa began suffering from anxiety
at least as early as November 2005.  Id. at 229.  At that time,
her anxiety was noted to be "stable."  Id.  In June 2006, Sousa
was unable to sleep, felt her heart beating rapidly, and
experienced shortness of breath and chest pains after working a
double shift.  Id. at 230.  She was treated at Charlton Memorial
Hospital; both an EKG and a chest x-ray were negative, and she
was diagnosed with anxiety.  Id.

In July 2007, Sousa reported to physician's assistant Lynne
Bisbano ("Bisbano") that she suffered episodes of anxiety
approximately five days per week.  Id. at 235.  Bisbano
prescribed Fluoxetine to treat the anxiety.  Id.  Sousa, however,
could not tolerate the side effects of the Fluoxetine and ceased
taking it.  Id. at 237.  As a result, in August 2007, she was
prescribed Citalopram and Xanax to treat her anxiety.  Id. at
236.  In February 2008, Sousa reported increasingly frequent

intermittent heart palpitations and stated that she was not taking the prescribed Citalopram daily.  Id. at 239.

In April 2008, Sousa was evaluated by a psychiatrist, Dr. Robert Cserr ("Dr. Cserr").  Id. at 176-78.  Sousa reported to Dr. Cserr that she suffered from panic attacks and feelings of being overwhelmed.  Id. at 176.  Dr. Cserr diagnosed Sousa with panic disorder and dysthymic disorder.  Id. at 178.  He noted that her anxiety caused her to be dysfunctional but that she had little trouble with daily activities and was "generally okay" with social interaction.  Id. at 176.  Dr. Cserr gave Sousa a Global Assessment of Functioning score of 60, which reflects moderate symptoms.  Id. at 178.  He stated that he believed more intensive medication management would benefit Sousa.  Id. at 176.

In July 2008, Sousa returned to her primary care physician, Dr. Grady, complaining of chest pains.  Id. at 243.  Dr. Grady noted that the chest pain could be caused by Sousa's anxiety and increased her dosage of Citalopram.  Id.  In August 2009, Sousa complained about the side effects of Citalopram, but Dr. Grady renewed the prescription.  Id. at 302-03.  Dr. Grady also recommended that Sousa pursue counseling.  Id. at 303.  Sousa began counseling with Barbara Kusinitz in January 2010.  Id. at 318.

### 5.  State Agency Assessments

Sousa was assessed by four non-examining state agency

physicians when she applied for disability benefits. Dr. Walter
Harrison ("Dr. Harrison") reviewed Sousa's records and completed
a physical residual functional capacity assessment in April 2008.
Id. at 181-88. He opined that Sousa could frequently lift and
carry ten pounds and occasionally lift and carry twenty pounds;
that she could stand or walk for a total of about six hours with
normal breaks; that she could sit for a total of about six hours
with normal breaks; and that she could occasionally climb, kneel,
crouch, or crawl. Id. at 182-83. He also stated that Sousa had
only limited use of her right arm for pushing, pulling, and
overhead reaching. Id. at 182, 184.

Dr. Marcia Lipski ("Dr. Lipski") reviewed the available
evidence and completed a residual functional capacity assessment
in September 2008. Id. at 271-78. She agreed with Dr. Harrison
regarding Sousa's ability to lift and carry loads; sit, stand,
and walk for six hours with normal breaks; and occasionally
climb, kneel, crouch, or crawl. Id. at 272-73. She opined that
Sousa could only occasionally reach overhead with her right arm,
but that she was unlimited in her ability to push or pull with
her right arm. Id. at 272, 274. Noting Sousa's history of
incontinence, Dr. Lipski stated that Sousa would need access to a
bathroom as needed. Id. at 272.

Nancy Keuthen, a state agency psychologist, completed a
Psychiatric Review Technique in May 2008. Id. at 190-202. She

opined that Sousa had mild limitations in social functioning,
concentration, and daily activities.  Id. at 200.  Based on this,
she concluded that Sousa's mental impairments were not severe.
Id. at 190.

Lastly, Mary Ford Clark ("Clark"), another state agency
psychologist, reviewed the record evidence in August 2008.  Id.
at 256-68.  She stated that Sousa had no restriction in daily
activities but mild limitations in social functioning and
concentration.  Id. at 266.  She completed a mental residual
functional capacity assessment, stating that Sousa had no
limitations in understanding or memory; that she was able to
manage simple tasks requiring attention, concentration,
persistence, and pace; that she had no limitations with social
demands; and that she was able to manage simple adaptational
demands.  Id. at 254.  Clark opined that Sousa was moderately
limited in her ability to complete a normal work day.  Id. at
253.

## II.  LEGAL STANDARD

### A.    Standard of Review

Under 42 U.S.C. § 405(g), a district court has the power to
affirm, modify, or reverse a decision of the Commissioner.  The
district court must make its decision based on the pleadings and
transcript of the record before the Commissioner; "[t]he findings
of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive . . . ."
42 U.S.C. § 405(g); see Manso-Pizarro v. Sec'y of Health & Human
Servs., 76 F.3d 15, 16 (1st Cir. 1996).  The First Circuit has
clarified this standard as requiring a court to uphold the
Commissioner's findings if "a reasonable mind, reviewing the
evidence in the record as a whole, could accept it as adequate to
support his conclusion."  Irlanda Ortiz v. Sec'y of Health &
Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting
Rodriquez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222
(1st Cir. 1981)).  As it is the role of the Commissioner to draw
factual inferences, make credibility determinations, and resolve
conflicts in the evidence, the Court must not perform such tasks
in reviewing the record.  Id.  Complainants face a difficult
battle in challenging the Commissioner's determination because,
under the substantial evidence standard, the Court must uphold
the Commissioner's determination, "even if the record arguably
could justify a different conclusion, so long as it is supported
by substantial evidence."  Rodriquez Pagan v. Sec'y of Health &
Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

   **B.   Social Security Disability Standard**

   An individual is considered disabled if she is "[unable] to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Administration has promulgated a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience. Id.

The claimant bears the burden in the first four steps to show that she is disabled within the meaning of the Act. Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982). Once the claimant has established that she is unable to return to her former employment, the burden shifts to the Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy. Id.

**III. THE HEARING OFFICER'S DECISION**

The hearing officer applied the five step analysis described

above.  At the first step, he concluded that Sousa had not
engaged in substantial gainful activity since November 2, 2007.
Admin. R. 9.  At the second step, the hearing officer found that
Sousa suffered from three severe impairments: residuals of right
shoulder injury, status post two surgeries; lumbosacral
degenerative disc disease; and anxiety.  Id.  At the third step,
the hearing officer determined that none of these severe
impairments, nor their combination, met or medically equaled one
of the impairments listed in Appendix 1 of Subpart P of Part 404.
Id. at 10.

At the fourth step, the hearing officer concluded that Sousa
had the residual functional capacity to perform a wide range of
light work.  Id. at 11.  She was limited to unskilled work that
did not require more than occasional climbing, balancing,
stooping, kneeling, crouching, or crawling.  Id.  She could not
reach above her head with her right arm and could not perform
work that required her to move her right arm behind her back.
Id.  Lastly, she was limited to work that would not require her
to change work settings or work processes more than occasionally.
Id.  At the fifth step, based on these findings and upon a
hypothetical presented to a vocational expert, the hearing
officer found that Sousa could perform her past relevant work as
an assembler or could alternatively perform work as a hand
packer, production worker, or production inspector, which jobs

13

existed in significant numbers in the Southeastern

Massachusetts/Rhode Island economy.  Id. at 17 & n.3.

Consequently, the hearing officer concluded that Sousa has not

been disabled since November 2, 2007.  Id. at 17.

## IV.  ANALYSIS

Sousa challenges the hearing officer's findings at the

fourth and fifth steps of the analysis: his determination that

she has the residual functional capacity to perform light work

and his finding that she could return to her past job as an

assembler.

### A.  Residual Functional Capacity

Sousa disputes the hearing officer's finding that she had

the residual functional capacity to perform light work subject to

several limitations.  Specifically, she argues that he failed to

include in his finding limitations on her repetitive use of her

arms and on her ability to push and pull with her right arm.  See

Mem. Supp. Pl.'s Mot. Reverse Decision Commissioner ("Pl.'s

Mem.") 13-14, ECF No. 12.

First, Sousa claims that the hearing officer improperly

excluded from her residual functional capacity a limitation on

repetitive movements of her arms.  She rests this argument on a

note by Dr. Stern in his June 2008 evaluation of Sousa: "At this

point, I do not think [Sousa] would be able to do a lot of

repetitive work with her arms, like washing windows, folding

laundry." Admin. R. 203. Sousa asserts that the hearing officer
ignored this assessment by Dr. Stern in determining her residual
functional capacity.

In fact, although the hearing officer did not mention this
specific statement by Dr. Stern, he did twice refer to the June
2008 notes containing it. See id. at 14, 16. He emphasized Dr.
Stern's statements that Sousa "ha[d] done really well," and that
her shoulder was "pretty much back where we would expect it to
be." Id. The hearing officer is not required to - nor could he
reasonably - discuss every piece of evidence in the record. See
National Labor Relations Bd. v. Beverly Enters., 174 F.3d 13, 26
(1st Cir. 1999).

Moreover, the hearing officer assigned substantial weight to
the opinion of state agency physician Dr. Lipski, whose
assessment of Sousa included a review of Dr. Stern's June 2008
notes. See Admin. R. 272. Dr. Lipski relied on Dr. Stern's
objective statement in his June 2008 notes that Sousa had good
range of motion in her shoulder. See id. This objective medical
evidence properly took precedence over an alleged limitation that
seemed to be based on Sousa's subjective complaints. See id. at
203 (including in Dr. Stern's notes Sousa's complaint that "[s]he
has difficulty doing repetitive movements"). Accordingly, this
Court sees no error in the hearing officer's silence regarding
this single statement by Dr. Stern and rules that the omission

from Sousa's residual functional capacity of a limitation on repetitive use of her arms was supported by substantial evidence.

Second, Sousa claims that the hearing officer improperly failed to include in her residual functional capacity a limitation on her ability to push and pull with her right arm. See Pl.'s Mem. 13. This claim relies on a note in the assessment of Dr. Harrison, a state agency physician: "limit push/pull [right arm]." Admin. R. 182. As above, Sousa argues that the hearing officer ignored Dr. Harrison's assessment. Pl.'s Mem. 13.

The hearing officer actually specifically mentioned Dr. Harrison's opinion as to this limitation in his decision. Admin. R. 15. He then stated that he "generally agree[d]" with Dr. Harrison's assessment and also with that of Dr. Lipski. Id. The hearing officer did not, however, include this limitation in his determination, though he included all other limitations identified by Dr. Harrison. See id. at 11.

The omission of the limitation on the ability to push and pull is supported by substantial evidence. The fact that the hearing officer "generally" agreed with the assessment of Dr. Harrison did not mean that he was required to accept every statement in that assessment. The rejection of the limitation on pushing and pulling is supported by the fact that Dr. Lipski opined that Sousa was not limited in this respect. Id. at 272.

Dr. Lipski's evaluation took place after that of Dr. Harrison and included additional medical evidence. The hearing officer's reliance on Dr. Lipski's opinion that Sousa did not have a limitation on the ability to push and pull with her right arm was thus reasonable and supported by substantial evidence.

Accordingly, the Court rules that the hearing officer's findings regarding Sousa's residual functional capacity were supported by substantial evidence; those findings are affirmed.

### B. Vocational Expert Hypothetical

Sousa next argues that the hearing officer failed to include all of her impairments in the hypothetical he presented to the vocational expert at the hearing. See Pl.'s Mem. 14. The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis. See Espada-Rosado v. Comm'r of Soc. Sec., 25 Fed. App'x 5, 6 (1st Cir. 2001) (per curiam). In order to be substantial evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations. See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982); Musto v. Halter, 135 F. Supp. 2d 220, 232 (D. Mass. 2000).

Here, the hearing officer presented to the vocational expert a hypothetical person of Sousa's age, education and work background with a residual functional capacity for unskilled

light work with only occasional climbing, balancing, stooping, kneeling, crouching, and crawling; only occasional reaching above her head; no reaching behind her back; and only occasional changing of work setting. Admin. R. 46-47. Based on this hypothetical, the vocational expert opined that Sousa could perform her past work as an assembly worker. Id. at 47.

Sousa claims that the hearing officer improperly excluded from the hypothetical limitations on her ability to perform repetitive movements with her arms and on her ability to push and pull with her right arm. See Pl.'s Mem. 14. As discussed above, the hearing officer's omission of these limitations from his determination of Sousa's residual functional capacity was supported by substantial evidence. As such, he properly excluded them from the hypothetical presented to the vocational expert.

Sousa also claims that the hearing officer erroneously omitted Sousa's need for breaks from the hypothetical he presented to the vocational expert. Id. at 14-15. Sousa claims that she would require breaks throughout the day due to both her urinary incontinence and her anxiety. Id. at 15. Even though the hearing officer did not find Sousa's urinary incontinence to be a severe impairment, see Admin. R. 9, any limitations from the incontinence ought properly be considered in combination with Sousa's other limitations. See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1126 (1st Cir. 1986). Here,

however, the hearing officer's decision not to include any need for breaks in the hypothetical presented to the vocational expert was supported by substantial evidence.

First, the hearing officer explicitly found that Sousa's urinary incontinence was not severe and did not impose any vocationally relevant limitations.  See Admin. R. 10, 17 n.3. Sousa seems to challenge this finding based on Dr. Lipski's opinion that Sousa would require bathroom breaks as needed.  Id. at 272.  That opinion was based on medical notes from June 2008. Id.  In June 2008, however, Dr. Ali performed surgery on Sousa to fix her urinary incontinence.  Id. at 213.  There is no medical evidence in the record that the urinary incontinence continued after that procedure.  Thus, the hearing officer's decision not to include a limitation concerning Sousa's claimed need for additional bathroom breaks was supported by substantial evidence.[1]

Second, the hearing officer noted Clark's opinion that Sousa was moderately limited in her ability to complete a normal work

---

[1] In her memorandum, Sousa relies on statements by the vocational expert that fewer jobs would be available to her if she required two unscheduled bathroom breaks per day and that no jobs would be available if she required four unscheduled bathroom breaks per day.  See Pl.'s Mem. 14-15.  She offered no medical evidence supporting these two alternative hypotheticals.  Even Dr. Lipski merely opined that Sousa would need bathroom breaks as needed, and there is no evidence that such a requirement could not be met by the three normal breaks during an eight-hour work day.

day because of her anxiety, but emphasized that Clark also stated that Sousa "would be able to manage simple tasks and simple adaptational demands." Id. at 16. Based on Sousa's psychological limitation, the hearing officer limited her to unskilled work that would require only occasional changes in work setting or work processes. See id. at 11, 16; see also id. at 47 (including these limitations in hypothetical presented to vocational expert). Sousa disputes this, claiming that the hearing officer also should have included a limitation that Sousa would face potential psychological interruptions to a normal work day and work week. Pl.'s Mem. 15. There is no evidence that would support, much less require, such a limitation. Other than Clark's opinion that she was moderately limited in her ability to complete a normal work day and work week, psychological evaluations of Sousa found only mild limitations and generally found Sousa capable of carrying out simple tasks. See Admin. R. 190-202, 256-68. Moreover, Sousa identifies no statements by any of the doctors who treated her anxiety that she would be unable to complete a normal work day without psychological interruption. Thus, the hearing officer's exclusion from the hypothetical of a limitation that Sousa may suffer potential psychological interruptions to the work day was supported by substantial evidence.

Accordingly, this Court rules that the hypothetical upon which the vocational expert based his opinion accurately reflected the hearing officer's determination of Sousa's vocationally relevant limitations.  This determination was supported by substantial evidence and is affirmed.

**V.    CONCLUSION**

For all the reasons stated above, this Court DENIES Sousa's motion to reverse, ECF No. 11, and GRANTS the Commissioner's motion for an order affirming his decision, ECF No. 14.  Judgment shall enter for the Commissioner.

SO ORDERED.

    /s/ William G. Young
     WILLIAM G. YOUNG
     DISTRICT JUDGE